

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 2, 2021

**BY EMAIL AND ECF**

The Honorable Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007
SteinNYSDChambers@nysd.uscourts.gov

      Re:    *United States v. Ryan Hult,* S10 17 Cr. 243 (SHS)

Dear Judge Stein:

      The Government respectfully submits this letter in connection with the sentencing of Ryan Hult ("Hult" or the "defendant"), currently scheduled for July 9, 2021, at 12:00 p.m. In connection with sentencing, the Probation Office has determined that the applicable range under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") is 188 to 235 months' imprisonment to be following by a mandatory consecutive term of imprisonment of 24 months, for a total Guidelines Range of 212 to 259 months' imprisonment. (*See* Presentence Report dated June 3, 2021 ("PSR") ¶ 138). The PSR recommends that the defendant receive a total sentence of 60 months' imprisonment. (PSR pp. 30). The parties' sentencing agreement, dated May 25, 2021, attached hereto as Exhibit A, also calculates the applicable Guidelines range as 212 to 259 months' imprisonment (the "Stipulated Guidelines Range"). For the reasons set forth below, the Government respectfully submits that a sentence below the Stipulated Guidelines Range is appropriate in this case.[1]

      **I.    Background**

          **A.  Role in the Offense**

      Since early 2016, the Government, in partnership from the New York City Police Department ("NYPD") and Homeland Security Investigations ("HSI") has been investigating a large-scale telemarketing scheme targeting elderly and vulnerable victims (the "Victims") throughout the United States. As the Court learned while presiding over the related case (and trial)

---

[1] In light of the sensitive nature of certain of the information set forth herein and in Exhibit A attached hereto, the Government has filed a redacted version of this letter on ECF without Exhibit A and will submit by email an unredacted version of this letter with Exhibit A, which the Government respectfully requests be filed under seal.

Rev. 07.20.2016

in *United States v. Ketabchi*, 17 Cr. 243 (SHS), Victims all over the country were convinced to invest their entire life savings, drain their retirement funds, and incur tens of thousands of dollars in credit-card debt based on false promises made by the *Ketabchi* defendants that the Victims would earn money through "online businesses" created and managed by those defendants and their co-conspirators (the "Business Opportunity Scheme"). In fact, the businesses did not exist, and the Victims never earned the promised returns.

As the Court will recall from the October 2018 trial of Andrew Owimrin and Shahram Ketabchi, the Government's investigation initially focused on a series of New York and New Jersey-based telemarketing sales floors that obtained "leads" for the Business Opportunity Scheme that originated in Arizona and Utah. William Sinclair described how his sales floor, Olive Branch Marketing, generally sold business opportunity, or "Biz Opp," products and that Hult provided Olive Branch with lead lists of Victims to be contacted by Olive Branch. (*See* Trial Transcript, *United States v. Ketabchi*, ("Tr.") at 196 ("Q. Ryan Hult is a new name. Who is Ryan Hult? A. Ryan Hult was our sales manager at The Tax Club and provided us with basically all of our leads from 2014 through 2015, same time frame from before.").

As Sinclair described, and as the Government's investigation revealed, beginning in around 2006, Hult was the sales manager at the Tax Club who supervised, among others, Sinclair, Michael Finocchiaro, and Arash Ketabchi. (PSR ¶¶ 23, 109). When the Tax Club was shut down following a Federal Trade Commission ("FTC") investigation in around 2012, Hult, along with Jason Sager, opened their own sales floor called Top Shelf Marketing ("Top Shelf"), which continued to operate the Business Opportunity Scheme in the New York City area. (PSR ¶ 24). Top Shelf, and later Reliable Business Consultants ("Reliable") upsold Victims with tax and other products after those Victims had purchased so-called "coaching" from companies in Utah, including companies that employed Jennifer Shah and Stuart Smith, who are now defendants in *United States v. Cheedie*, 19 Cr. 833 (SHS)). In or about 2013, Top Shelf, Reliable, and Hult became the subject of a separate FTC investigation. (PSR ¶¶ 108-9). As part of Hult's effort to resolve that FTC investigation in 2015, Hult submitted a financial disclosure to the FTC under penalty of perjury. In the financial disclosure, Hult lied about his income and assets, and concealed that he had diverted money to his father and to several legitimate businesses in order to hide his assets from the FTC. (PSR ¶ 25). As part of the FTC resolution, which was finalized in January 2016, Hult agreed to a ban on his continuing to work in the telemarketing industry. (PSR ¶ 110).

Rather than leave the industry as required by the FTC ban, Hult instead began acting as a lead broker, who charged a fee to connect coaching and grant floors in Arizona and Utah with sales floors in New Jersey and New York. (*See* Trial Tr. at 205 ("[Hult] operated his own sales floor and then became just a lead broker."); *id.* at 204 ("Q. What were some of the lead brokers that you used during 2014 and 2015? A. There were really only two. Ryan Hult was responsible for the overwhelming majority of our lead flow.).) Specifically, Hult procured leads (including stolen leads) from sales floors in Arizona and Utah operated by Shane Hanna, Chad Allen, Kevin Handren (all defendants in *Cheedie*) and sold them to sales floors in New York and New Jersey, including floors operated by Ketabchi, Sinclair and Finocchiaro (all his co-defendants in the *Ketabchi* case). (PSR ¶ 26).

In or about March 2017, Hult learned that several other members of the Business Opportunity Scheme had been arrested in the *Ketabchi* case. (PSR ¶ 27). At the time, Hult continued to broker leads, but was also involved in other businesses, including a vape store and a restaurant. (PSR ¶¶ 102, 105). In 2017, Hult told his then-business partner in a restaurant ("Individual-1") about the investigation and Hult expressed his concerns that he might be arrested. A short time later, Individual-1 (falsely) told Hult that Individual-1 had been approached by an agent of the Federal Bureau of Investigation ("FBI"), and that the agent had asked for a bribe in exchange for the agent declining to investigate and/or arrest Hult. Hult, along with Joseph Minetto (Hult's cousin and former partner in Top Shelf) and another individual involved in the Telemarketing Scheme, together paid Individual-1 approximately $186,000, which Hult understood would be used to pay off the FBI agent. In fact, Hult and his co-conspirators were duped by Individual-1 and there was no FBI agent. (PSR ¶ 27).

Following the arrest of the *Ketabchi* defendants in early 2017, and notwithstanding the FTC ban, Hult continued to broker leads from Utah and Arizona coaching and grant floors, and worked to open a new sales floor in Englewood, New Jersey operating under the name Corporate Development Center and Alliance Education ("CDC/Alliance"). (PSR ¶ 103). CDC/Alliance was managed by Joseph Ciaccio and Minetto, and employed Derrek Larkin, Joseph DePaola, and Mattie Cirilo (all of whom were later charged in *Cheedie*). Hult managed CDC/Alliance behind the scenes, introducing Ciaccio and Minetto to Handren and Cameron Brewster, and sharing in the floor's profits.

Following the resolution of the *Ketabchi* case in late 2018, the Government's investigation shifted, in part, to those telemarketing sales floors like CDC/Alliance that continued to operate in the New York and New Jersey area despite the *Ketabchi* case. In January 2019, HSI executed a search warrant at the CDC/Alliance office, during which search HSI collected paper documents and electronic devices from the employees who were present. Hult was not present, but individuals inside the CDC/Alliance office provided the HSI agents with Hult's phone number. One of the case agents called Hult and told him that Hult was the target of HSI's investigation.





Rev. 07.20.2016



## II.   Defense Submission

Hult requests a significant downward variance of 24 months' imprisonment on counts One, Three, Four and Five, to run consecutive to the mandatory 24 month sentence on Count Two, citing Hult's ███████████████████████████████████ and his remorse.

## III.   Applicable Law

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Thus, the Guidelines are more than "a body of casual advice, to be consulted or overlooked at the whim of

a sentencing judge." *United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). The applicable Sentencing Guidelines range "will be a benchmark or a point of reference or departure" when considering a particular sentence to impose. *United States v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005). In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims." *Booker*, 543 U.S. at 259-60 (citations omitted).

Along with the Guidelines, the other factors set forth in Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. . . .

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

The Second Circuit has instructed that district courts should engage in a three-step sentencing procedure. *See Crosby*, 397 F.3d at 103. First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence and all of the facts relevant to the determination of a non-Guidelines sentence." *Id*. at 112. Second, the Court must consider whether a departure from that Guidelines range is appropriate. *Id*. Third, the Court must consider the Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence to impose, whether it be a Guidelines or non-Guidelines sentence. *Id*. at 113. In so doing, it is entirely proper for a judge to take into consideration his or her "own sense of what is a fair and just sentence under all the circumstances." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

## IV. The 3553(a) Factors Support a Sentence Below the Guidelines in this Case

A sentence below the Stipulated Guidelines Range is appropriate in this case and should reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. Such a sentence is also appropriate to achieve the goal of deterrence to criminal conduct and to avoid unwarranted sentencing disparities among similarly situated defendants.

Every dollar in the defendant's roughly $10 million restitution figure represents money obtained directly from Victims of the sales floors to which Hult supplied leads. This money represents, in most cases, the hard-earned money of working or retired, everyday people who were duped into thinking they could invest their money and save for retirement or generate some supplemental income during their retirement by applying for a government grant that did not exist. In many cases, the defendant earned this money in small chunks – $1,000 here, $3,000 there – demonstrating the sheer number of Victims the defendant reached. And the defendant himself has agreed to forfeit $2.5 million, demonstrating how much money he personally made over his many years committing the charged crimes.

The defendant's scheme was extensive in its planning, execution, and duration. Notwithstanding the FTC's prior action against the Tax Club and Top Shelf, and the ban on Hult operating in the telemarketing industry, Hult committed the Business Opportunity Scheme for many years both as a lead broker and as an operator on a sales floor. He was brazen and sophisticated in his fraud, operating in the shadows for years and making millions without ever having to attach his name to a sales floor that might draw law enforcement scrutiny. And when Hult thought law enforcement might be coming for him following the *Ketabchi* case in 2017, he initially paid more than $180,000 that he understood would be used to bribe a federal agent into making the case against him go away. Moreover, even as this Court oversaw a trial at which Hult featured and as this Court was imposing prison sentences on Arash Ketabchi, Andrew Owimrin and others in 2018 and 2019, Hult was continuing to broker leads to other sales floors, and was secretly operating and providing leads to CDC/Alliance. Against this backdrop, a significant sentence of imprisonment is necessary to provide just punishment, to promote respect for the law, and provide general and specific deterrence.



nstead, a significant sentence of imprisonment of less than the Guidelines Range would serve the purposes

of sentencing in this case, including the need to avoid unwarranted sentencing disparities among similarly situated defendants, such as Arash Ketabchi and Carl Morris.

## V.  Conclusion

In light of the foregoing, the Government respectfully requests the Court impose a significant sentence of imprisonment in this case, but submits that a sentence within the Stipulated Guidelines Range would be greater than necessary to serve the aims of sentencing in this case.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: _____
Kiersten A. Fletcher
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-2238/2616

Cc:  Counsel of Record (by ECF and email)

Rev. 07.20.2016