L79ChulS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          17 CR 243 (SHS)

RYAN HULT,

                Defendant.

------------------------------x

                                        New York, N.Y.
                                        July 9, 2021
                                        12:00 p.m.


Before:

                    HON. SIDNEY H. STEIN,

                                        District Judge

                        APPEARANCES

AUDREY STRAUSS,
      United States Attorney for the
      Southern District of New York
BY:   ROBERT B. SOBELMAN
      Assistant United States Attorney

ERIC V. KLEINER, ESQ.
      Attorney for Defendant

SOUTHERN DISTRICT REPORTERS, P.C.
            (212) 805-0300

L79ChulS

1            (Case called)

2            MR. SOBELMAN:  Robert Sobelman for the United States.

3    Joining by telephone is Kiersten Fletcher.  Good afternoon,

4    your Honor.

5            MR. KLEINER:  Good afternoon, your Honor.  Eric

6    Kleiner, 59 Jefferson Street, Nyack, New York, on behalf of

7    Mr. Hult, who is to my left.

8            THE COURT:  Good afternoon, gentlemen.  I'm informed

9    that, under the new COVID procedures, if you have been fully

10   vaccinated, you can remove your masks.  My deputy will give you

11   a form to fill out for contact tracing purposes if need be, but

12   you can remove it only if fully vaccinated.

13           Also, this is a public hearing and there is an open

14   line.  I don't know how many people are on it.  I believe

15   everyone is in listen-only mode, if I'm not mistaken.

16           We're here for the sentencing of Mr. Hult.  I have the

17   presentence report prepared on April 29, 2021, and revised on

18   June 3rd, 2021, along with the addendum and the sentencing

19   recommendation of 60 months on a guideline range of 188 to 235,

20   plus consecutive 24 months imprisonment on count 2, which is

21   the aggravated identity theft, for a range of 212 to 259

22   months.

23           I also have the sentencing memorandum of the

24   defendant, which is document 626, and I have the sentencing

25   memorandum of the government, which is dated July 2, and it's

L79ChulS

1    under seal because it attaches another document dated May 25,

2    2021.

3            I also have a letter from Mr. Hult's parents, which is

4    document 627.  It's really wonderful to see how Mr. Hult's

5    parents are fully supportive of him, but like most parents,

6    they don't see the whole person, they just see their little

7    boy, their son.  But the letter, as I say, it's very nice to

8    read how thoroughly supportive of him they are.

9            Is there any additional information I should have,

10   defense counsel?  I'll give you an opportunity to speak.  Is

11   there any additional written information I should have?

12           MR. KLEINER:  No additional written information.  Just

13   our presentation, Judge.

14           THE COURT:  Have you and your client had a full

15   opportunity to read this information and have you, in fact,

16   discussed it with your client?

17           MR. KLEINER:  Yes, sir.

18           THE COURT:  Government, anything written in addition I

19   should have?

20           MR. SOBELMAN:  No, your Honor.  I anticipate being

21   able to hand up a fully executed consent preliminary order of

22   forfeiture.

23           THE COURT:  Do that now.

24           MR. SOBELMAN:  Yes, your Honor.  We're going to ask

25   for a period of time to submit a restitution order after today.

L79ChulS

1                THE COURT:  I thought we have a stipulated

2     restitution?

3                MR. SOBELMAN:  We do, your Honor.  We have the amount.

4     We just need to prepare the schedule of victims.

5                THE COURT:  What are you handing up, forfeiture?

6                MR. SOBELMAN:  Yes, your Honor.

7                THE COURT:  So you're not handing up a proposed

8     restitution order because you don't have the schedule; is that

9     it?

10               MR. SOBELMAN:  Yes, your Honor.  We would ask for one

11    week.

12               THE COURT:  We'll deal with it when I get to it.  I

13    think you said there is no additional written information you

14    seek me to have?

15               MR. SOBELMAN:  That's correct, your Honor.

16               I am vaccinated.  Rather than yell through the mask,

17    if I can remove it, I'd be happy to fill out the form after the

18    proceeding.

19               THE COURT:  I'm not sure what you're telling me, sir.

20               MR. SOBELMAN:  I'm going to remove my mask now.

21               THE COURT:  If you're fully vaccinated, you may remove

22    your mask.  Just make sure that defense counsel, Mr. Kleiner,

23    the government counsel, Mr. Sobelman, give their contact

24    information to my deputy.

25               MR. SOBELMAN:  We will, your Honor.  Thank you.

L79ChulS

1          THE COURT:  Mr. Kleiner, do you have any objections to

2     the findings of fact in the presentence report?

3          MR. KLEINER:  No, your Honor.

4          THE COURT:  Government?

5          MR. SOBELMAN:  No, your Honor.

6          THE COURT:  I adopt the findings of fact in the

7     presentence report.

8          Mr. Kleiner, why don't you talk to me here.  I

9     presided over the trial of the Ketabchi action, and I was very

10    surprised at how early on your client was involved in all of

11    the scams.  The progenitor of all this is the Tax Club, and I

12    remember Sinclair's testimony, astonishing testimony, it was

13    closed by the FTC.  Your client was there.  He then started Top

14    Shelf.  I remember testimony of Top Shelf.  He had problems

15    with the FTC there, as well.  He lied to the FTC.

16         It's sort of a very odd turn of events, that he tried

17    to bribe an FBI agent and it turns out that it was a scam that

18    one of the upstanding people here was scamming him, pretending

19    that he was going to pass the money on to bribe somebody else.

20    That's the world your client lived in.

21         On the other hand, he has no criminal convictions that

22    I'm aware of, which is wonderful.  He's had a rather difficult

23    family life.  He's had a drug problem.  It looks like a serious

24    drug problem.  He had difficulties growing up, although with

25    anxiety issues, although his parents seem to think more of it

L79ChulS

1    than he does.  The drug use was rampant, cocaine, ecstasy,

2    Oxycodone.  He agreed to cooperate.  He made real efforts at

3    cooperation, to use the vernacular, he blew that, one of the

4    many mistakes he's made.

5          I do want to ask the parties about what's in the

6    papers about continuing cooperation.  He's been remanded ever

7    since he had those arrests in New Jersey.  It looks like he was

8    a very active cooperator.  I note here from my reading, it says

9    he had 200 taped conversations.

10          So, he's an interesting person and complicated, as

11    everybody is.

12          Speak to me.

13          MR. KLEINER:  Yes, your Honor.  It's very clear, your

14    Honor is extremely familiar with all of the unfortunate facts

15    and the crimes that were committed.

16          THE COURT:  Well, these are so -- I've been at this

17    long enough that I shouldn't be bothered by it, but somebody

18    with real potential, family support, very much had family

19    support, as I've indicated.

20          MR. KLEINER:  I think it's good that you're bothered

21    by it.

22          THE COURT:  Education, BA.  Fabulous athletic career.

23    Can't seem to make a go out of it in the real world.  He's been

24    involved with such serious scams.

25          MR. KLEINER:  Yes, your Honor.

L79ChulS

1    THE COURT:  I mean, the people, I'm still bothered by

2    the victims of the Ketabchi case who testified.  Many of them,

3    their lives were ruined, and he was an active participant.

4    MR. KLEINER:  I'm bothered by it, also, Judge, and I

5    think that we need judges that are bothered by it and are not

6    immune to it, after thousands of cases, are not just moving on

7    to the next one.  So we applaud that, Judge, because we need

8    you to protect society.

9    The role that I'm playing today usually is taking as

10   much as I can from the presentence report and the cooperation,

11   and trying to convince a judge to get the least possible

12   sentence for my client, that's my oath.  Thinking about it

13   today, Judge, and yesterday, what I was going to say to you,

14   after 35 years starting in Barry Scheck's criminal law clinic

15   just up the road at Cardozo, I've done so many of thousands of

16   cases, and I think the big issue I wanted to discuss with you

17   is what is the possibility of reoffending, because when you

18   look at the presentence report, the things that I think you

19   don't know are the things I do know.  So, I don't have a

20   crystal ball, but I have seen some things, Judge, that would

21   tell you that the person that came before the magistrate when

22   he pled guilty is not the same person here.  I know you've

23   heard that before --

24   THE COURT:  I hear it every time.

25   MR. KLEINER:  You do.  But I have the facts that allow

L79ChulS

1    me to make the argument in good faith.

2          When Mr. Hult committed these crimes and cooperated,

3    like many cooperators, although it's substantial and he did it

4    before he was arrested, he turned himself in — and he gets

5    credit for that I know you'll give him credit, I believe you

6    will — he was not remorseful, Judge.

7          THE COURT:  He turned himself in after there was a

8    search of the premises.

9          MR. KLEINER:  Correct.

10          THE COURT:  The jig was up.

11          MR. KLEINER:  I agree.  But he was one of the first

12    ones to get in there, and he gets credit for that because he

13    helped the agents in so many ways in giving them the overview

14    of this very sophisticated scam.

15          But what I saw, Judge, in the 50-something pages of

16    notes that I took when he was being debriefed, what I saw was a

17    problem with narcism, drugs, mental health problems, he was

18    completely detached in almost a Trumpian way, that he was in an

19    alternative universe where it was everybody's fault, that he

20    was smarter than everybody.  And I know he went to Johnson &

21    Wales --

22          THE COURT:  That's a good university, by the way.  I

23    happen to know it.

24          MR. KLEINER:  It's a heck of a school, Judge.  He has

25    all those things, but, unfortunately, he thought that the world

L79ChulS

1   was his oyster and he could do bad things, because he could

2   make money and live the highlife, use the steroids, which are

3   probably the worst drugs that he used, are the anabolic

4   steroids.  When I first met Ryan Hult, Judge, he was three

5   times the size he is now.  He looked like somebody who was

6   taking serious anabolic steroids, like Mark McGwire.  That

7   really showed his problems, because he was completely detached

8   from his criminal activity.  Even when he was giving the agents

9   information in Utah, he was unable to come back down to earth

10  and realize that he's no better, no worse than anyone else.  He

11  was living in that type of universe.

12        I did not see the issues -- back then, I could never

13  argue, before you, the lack of a chance of recidivism or

14  reoffending.  What I did, see, Judge, was a continuing spiral

15  of everybody else's fault, it's always somebody else's fault.

16        What I couldn't get through to Mr. Hult was the thing

17  that hit me the most, all these years doing the work, I've seen

18  it all, they had a floor to stop people from getting refunds.

19  That's a bad sign.  And I never could get through to Mr. Hult

20  that that's the declaration against interest in and of itself,

21  that's a confession.  You're committing criminal activity

22  because you already have a floor set up to stop people from

23  getting their refunds because they have no opportunity to make

24  money on the things you're selling.  It was a scam.  You can

25  call it whatever you want, all these telemarketing scams, it's

L79ChulS

1    the bottom line, it's a white collar crime.

2            THE COURT:  I don't understand.  This is news?  What's

3    your point?  The testimony on the charge back efforts is

4    substantial.

5            MR. KLEINER:  Right.  But the point was how detached

6    he was from even when I would approach Mr. Hult and tell him,

7    even though he was cooperating and tell him these types of

8    things show the mental status that you know you're committing

9    crimes, and yet still being detached and still trying to live

10   the highlife.  This continued.  This continued during the

11   cooperation.  It didn't affect the cooperation and the

12   truthfulness.  He gave up himself on a case, as you said, the

13   fake FBI agent case, which shows how detached he was and how

14   grandiose his behavior was.  No one knew about that.  So that

15   goes in his credit, but he's giving up all the information,

16   even the things the government may not know.

17           What happened, though, Judge, when COVID hit, the

18   mental health problems became exacerbated and the drug problems

19   got much worse and he basically was living off the street.  His

20   marriage fell apart.  The people he was involved with were

21   people he was basically using for various purposes trying to

22   get into various businesses and make money.

23           What I noticed was somebody who was not getting it

24   still.  When we got on the phone with AUSA Fletcher and

25   Mr. Hult was in a windswept afternoon on the phone — drug usage

L79ChulS

1    was incredible at that moment — he agreed that he had to turn

2    himself in, and it probably saved his life.  He was getting to

3    the point where I don't know if he would have survived on the

4    street much longer, and he was doing those things trying to get

5    by, he had no money.  It didn't happen right away.

6           When he went to Essex County Jail — and since I'm a

7    New Jersey practitioner, also, Essex County Jail is a tough

8    place, a lot of gangs, very few Caucasians — he had two

9    seizures when he was coming out of the drug usage.  He had been

10   beaten up, he had injuries.  The Court knows what I've written

11   about that, and I think there is some argument about that type

12   of excessive hardship that he would probably never have seen in

13   a federal institution.  We know that about the Bureau of

14   Prisons.  But he got himself there.  He got mental health

15   therapy, thank God, at ECJ, and he got clean, and he's doing a

16   great job.

17          Still in the winter up to March when they made the

18   Utah arrest, which was the Salt Lake City arrest, I still felt

19   like he was like, what's the government going to do for me.

20   That's how I felt Mr. Hult was kind of feeling, like he had

21   assisted on those cases, including some assistance on that

22   case, he was like, what are they going to do for me.

23          It all changed for me when PSI started to do the

24   interview, the probation officer.  He was different.  He wasn't

25   making excuses.  He was providing truthful information, but it

L79ChulS

1    was his tone and his attitude.  Even when we got on the phone

2    with Ms. Fletcher, I think Mr. Sobelman may have been on one of

3    those calls, he was saying to the U.S. Attorney's office,

4    what's going to happen.  He was offering further cooperation.

5    There is definitely something about that, I didn't want to put

6    that in an unsealed fashion, but it's out there and he'll be

7    happy to talk to you about it.  But he never asked what's in it

8    for me.  He was communicating for the first time in the

9    presentence report and he was communicating to the U.S.

10   Attorney's office in a way that told me he got it, he was no

11   longer detached.  The drug usage was gone, the therapy was

12   coming, the medication was coming, and it was working.  The kid

13   that went to Johnson & Wales, I think he's here.

14        I've spent a lot of time with Mr. Hult, Judge.  I feel

15   bad for his family.  Good parents, good home.  But I feel that

16   Mr. Hult, in talking to his attorneys, started to apologize,

17   which is rare in our business, started to apologize about some

18   of the rough stuff that he had said when he was in the throws

19   of drug use, and some of the things that we couldn't do for him

20   when he blew the 5K because he got arrested.  He was no longer

21   blaming anyone.  He was sorry.  He was sorry he had acted the

22   way he did.  When he spoke to Ms. Fletcher, he never asked her

23   for any other thing.  He never asked for any additional

24   lowering of a sentence or anything.  He accepted it.  That was

25   the first time, Judge, he's accepted anything.

L79ChulS

1          That tells me, Judge, that Mr. Hult is not the same

2    person.  He's no longer detached.  He doesn't have the criminal

3    record.  The cases in New Jersey are cases where, right on the

4    heels of Governor Murphy and both at the ballot box, legalizing

5    marijuana, they're not prosecuting people for even distributing

6    small amounts or mid-level amounts, they're not arresting

7    people for it any longer.  He got arrested almost maybe within

8    a month of all of the laws changing and the AG guidelines

9    changing.  So, the marijuana case, although it's outstanding,

10   Judge, it's an outstanding case, I expect that case to

11   basically be somewhat de minimus.

12         The other case in Monmouth County that he didn't lose

13   his 5K on occurred when Mr. Hult was involved in the CBD trade.

14   It turned out, according to the prosecutor there, although I

15   don't have the written report, that Mr. Hult had CBD, large

16   amounts, that turned out to not be THC cannabinoid, turned out

17   to be CBD.

18         I think the discrepancy was or the difference was,

19   Judge, when Mr. Hult got arrested and he was that person that's

20   different than here, he blamed law enforcement.  He said, what,

21   they can't run a test at the New Jersey State Police lab to see

22   it's not THC.  It's all CBD.  It turned out that it was,

23   according to the prosecutor, when the FDA tested it and they

24   had better testing, he was right.  It looked like marijuana, it

25   smelled like marijuana, it smoked like marijuana, it tasted

L79ChulS

1    like marijuana, it had all the appearances of marijuana, and

2    somehow that wasn't the law enforcement's fault.  No, he was

3    involved in what is an unregulated dirty business, Judge.  The

4    CBD business is a dirty business.  The agents told him when he

5    was cooperating, this isn't good, this is a dirty business.

6    But, that's the superiority complex.  He didn't listen.  He

7    said, I'm going to make money, I'm going to pay restitution,

8    this is how I'm going to do it; of course, it failed.

9            So, I think the case in Monmouth is going to basically

10   be de minimus or it will die at a much lower --

11           THE COURT:  So what should I do?

12           MR. KLEINER:  I'm sorry?

13           THE COURT:  What's the view of the defense as to what

14   I should do?

15           MR. KLEINER:  Judge, I think that, based upon the fact

16   that I believe that Mr. Hult has all of the education and now

17   has a drug-free environment, he's going to do time, I think

18   that one of the things that you can rest much easier on is the

19   chances that he's going to reoffend are not good.  He's not

20   probably ever going to reoffend.  No one has that crystal ball,

21   but I feel that very strongly today.

22           THE COURT:  I'll tell you, without the input you're

23   giving me, that is the human input, the statistics are that

24   he's a prime candidate for reoffending in terms of a fraudster.

25           MR. KLEINER:  I know, Judge.  In the white collar

L79ChulS

1  cases, this attitude is the same attitude that we saw with

2  Mr. Hult that I saw with Mr. Hult when he first offended.

3        THE COURT:  What about general deterrence?  What about

4  punishment?

5        MR. KLEINER:  Judge, using the comparators that the

6  U.S. Attorney put together — did a great job, I'm certainly

7  relying on that, as well — I think that a sentence in between

8  two of the sentences that were administered in this case will

9  not send the wrong message to society, it will not be looked at

10  as the cost of doing business, these were not crimes,

11  theoretically, against -- the United States of America was not

12  an insurrection case, it was not a case of violence --

13        THE COURT:  Well, the sentences in Ketabchi ranged

14  from 87 to 78, 72, 15, 51, 52, 366 days.

15        What's your position?

16        MR. KLEINER:  My position is, Judge, as I said in the

17  sentencing memorandum, I don't think, in good conscience, I

18  could argue to you that the two years or the three years was

19  something that I felt confident with, given that the

20  presentence report had it at five years.  I think that the U.S.

21  Attorney's office, although they can't say they're in equal

22  view with my sentencing memorandum, I'm certainly hoping that

23  your Honor does not sentence him to more than four total years.

24  He's been in jail since November.  He's taking advantage of

25  everything that's possible for him to be rehabilitated.

L79ChulS

1          I think the big issues for you to consider, and it's

2     only you that can decide whether he should do four years or

3     more, or maybe slightly less if I'm successful today, but at

4     least I would ask your Honor not to impose more than four

5     years, given all the comparisons.

6          I think, Judge, the big issue, I think, is that he is

7     remorseful, Judge.  Unfortunately, it's hard for you to see it

8     in a PSI, but I see it based upon what I've seen in the last

9     three months, and I don't think he's playing a game, because

10    you weren't present when he was talking to Ms. Fletcher and you

11    weren't present when he was doing the PSI.  He could have been

12    his usual standoff self.  He's been improving, but really,

13    these last three months, I think he merits, Judge, something

14    from your Honor, and you'll certainly hear from him that four

15    years will not send the wrong message.  He'll be deterred.

16    Society will be deterred, as it should be, from committing

17    these types of offenses in the future.  It's going to be a

18    heavy sentence, because he's only been in since November, and

19    he's never done serious time before.  I certainly would like

20    him to be in a federal facility to get better treatment and not

21    be subjected to gang violence because he was --

22             THE COURT:  He's in federal custody now.

23             MR. KLEINER:  Yes.

24             THE COURT:  Thank you.

25             MR. KLEINER:  Judge, just, if I could, and I know that

L79ChulS

1    you've read everything that I submitted to you.  I just wanted

2    to say to the Court that I understand, because you sat here for

3    the trials, I understand that you have that ability to see

4    through all of the things that have been said to you in this

5    court, and it's easy to say you're remorseful, but I think,

6    Judge, that the way that the U.S. Attorney's office approached

7    their sentencing memorandum indicates to the U.S. Attorney's

8    office, not just me, that they think Ryan Hult is someone you

9    could take somewhat of a chance on and not sentence him to more

10   than four years.

11           I would say --

12           THE COURT:  The government took a chance on him.  Look

13   what happened.

14           MR. KLEINER:  You know, Judge, they took a chance on

15   him.  The types of offenses were not, of course, white collar.

16   I think the CBD is going nowhere.  The other case, the

17   marijuana, is something that's out there, but I think, Judge --

18           THE COURT:  Fair enough.  I get that point.

19           MR. KLEINER:  I would only say, Judge, with the

20   cooperation, he's going to continue to cooperate, whether he

21   gets credit or not for it.  I think that's a very good sign.

22           I wanted to close and tell your Honor that, although

23   Mr. Hult being incarcerated, he's not working -- I'm not going

24   to argue to your Honor that the faster he gets out, the faster

25   he makes restitution.  That's not a fair argument.  I'm not

L79ChulS

1       going to make it.  It may be a fact, but it doesn't work.

2                   What I wanted to close with, Judge, was that Mr. Hult

3       is not asking for any extra credit down the line.  He feels

4       that he can help stop future people from being victimized.  He

5       understands, took a long time, but he understands that there

6       were vulnerable people involved, and he understands he has to

7       live with that.

8                   THE COURT:  Does he understand he ruined a lot of

9       lives?

10                  MR. KLEINER:  He understands and he knows he has to

11      pay a price for it.  I think part of paying that price is that

12      he wants to work for the government to stop future people from

13      being hurt the way these people got hurt, and I think that he

14      can address that, Judge, and I hope and pray, Judge, that you

15      do not give him more than four years.

16                  THE COURT:  Thank you, sir.

17                  Mr. Sobelman.

18                  MR. SOBELMAN:  Thank you, your Honor.  This is maybe

19      the most sort of complicated or difficult of the sentencings I

20      think your Honor has seen in this case, and your Honor has

21      sentenced a number of people.

22                  Mr. Hult provided as much and probably more assistance

23      to the government than any other cooperator that we've had in

24      this investigation, and we've had a number of them, as your

25      Honor knows, but he breached his cooperation agreement.  He is

L79ChulS

1   an unusual case.  He provided --

2           THE COURT:  Why is he an unusual case?  He is a

3   longtime scammer.  He realized he better go with the flow here

4   and go with the team that was going to prevail at the end of

5   the day, and he helped you in his selfinterest.  Why is it an

6   unusual case?  Haven't you seen this time and time again?

7           MR. SOBELMAN:  In part, yes.  There are a few things

8   that make him different.

9           First is, on the sort of bad side of the ledger, he is

10  more culpable than all of the defendants in the Ketabchi

11  indictment.  If we're looking solely at his culpability, at his

12  conduct, at the length of his conduct, he was not listed in

13  that relative culpability letter because he was not a

14  publicly-charged person at the time, but he would have been at

15  the top of that list.

16          THE COURT:  He would have been along with Arash and

17  Wilson?

18          MR. SOBELMAN:  Or above them.

19          THE COURT:  Interesting.

20          MR. SOBELMAN:  More likely above them.

21          THE COURT:  All right.

22          MR. SOBELMAN:  As would have Carl Morris had he

23  appeared on that list.  He is more similar in culpability to

24  Carl Morris.

25          On the other side, he truly did provide very

L79ChulS

```
1    substantial assistance, not nearly barely meeting the standard

2    or sort of regular assistance.  As your Honor noted, he had had

3    an enormous number of recorded conversations.  Really, from day

4    one, notwithstanding, sort of, defense counsel's impression,

5    the government's impression was that he was genuine, sincere,

6    candid, truthful, and eager to be of assistance.  Of course,

7    that does align, at least at that time, with his selfinterest.

8         But, as your Honor has seen in this case, there were

9    some cooperators who, even though ultimately successful, start

10   off not being successful or, like Mr. Morris, as we explained a

11   few weeks ago at his sentencing, it appears in retrospect

12   really was never truthful with us.  That is not the case for

13   this defendant.

14        What's unusual, and at least I have not experienced

15   before, is even after we told the defendant that he was not

16   going to receive a 5K letter due to his additional criminal

17   conduct, he continued to meet with us, he continued to be

18   useful and helpful and truthful.  He was candid about his

19   additional criminal conduct, even though he knew that it may

20   cost him.  He's even provided additional evidence to us that

21   we've asked for since then, again, possibly in his selfinterest

22   so that I would say this right now, but his interest in

23   continuing to cooperate after sentencing, there will literally

24   be no benefit that one could think of.  We do think that's a

25   genuine offer.  He, at every step, has been willing, eager, and
```

L79ChulS

1    available to assist in whatever way he could, and while there

2    are a lot of people who do that and ultimately aren't that

3    helpful, he was extremely helpful.  We would not have been able

4    to make some of the investigative leaps that we have been able

5    to make in this case without his assistance.

6              THE COURT:  That's important.

7              MR. SOBELMAN:  His candor with us extended to his bad

8    conduct, even after his plea.  He was candid with us about his

9    drug use while on bail, and when we confronted him and said,

10   look, enough is enough, we think you should go in, he

11   surrendered, I believe, the same day, didn't fight us on it,

12   consented to it.  When we met with him subsequently while he

13   was incarcerated, he thanked us for insisting that he go in.

14   He told us, I believe genuinely, that he thinks we saved his

15   life by insisting that he be detained.  That's what makes it

16   unusual, I think.

17             There is a lot on both sides of the ledger here, and I

18   don't think it's an easy calculus to undertake.

19             Your Honor, I'll just highlight again, your Honor

20   sentenced Carl Morris to 78 months' imprisonment just a few

21   weeks ago.  Also a very culpable and senior member of the

22   telemarketing scheme --

23             THE COURT:  Also a cooperator who blew the

24   cooperation.

25             MR. SOBELMAN:  Yes, your Honor.  He's, sort of, the

L79ChulS

| | |
|---|---|
| 1 | best comparator that your Honor may have in this circumstance. |
| 2 | I think, as we previewed at Mr. Morris' sentencing and I want |
| 3 | to make sure is clear now, we view them very differently at |
| 4 | their sentencing.  Carl Morris provided sort of marginal |
| 5 | assistance.  We believe he was never fully truthful with us, |
| 6 | although we had thought he was at one point.  He hid money from |
| 7 | us, he lied to us about hiding money from us, he lied to us |
| 8 | about being involved in sort of an unrelated narcotics |
| 9 | conspiracy, he refused to meet with us, he refused to provide |
| 10 | us additional information.  There were a lot of problems with |
| 11 | Carl Morris along the way, both before and after we determined |
| 12 | not to write him a 5K letter.  As your Honor knows, he fought |
| 13 | us on that and accused us, I think inappropriately, of some |
| 14 | kind of bad faith.  It was a hotly-contested sentencing, as I'm |
| 15 | sure your Honor recalls, where my experience was it did not |
| 16 | seem he expressed much remorse or much regret for his conduct |
| 17 | either before or after he started cooperating.  Our experience |
| 18 | with Mr. Hult is very different. |
| 19 |             THE COURT:  Thank you. |
| 20 |             MR. SOBELMAN:  Thank you, your Honor. |
| 21 |             THE COURT:  Mr. Hult, you have the right to speak to |
| 22 | me at sentencing, sir.  You don't have to.  Anything you say |
| 23 | could be used against you.  But, if you want to speak to me, |
| 24 | tell me something, here I am. |
| 25 |             THE DEFENDANT:  Yes, your Honor.  Thank you. |

L79ChulS

1          Everything you said is true, all the crimes that I've

2     committed, the scamming, basically outlining the bad person I

3     was.  From that kid at Johnson & Wales, I turned.  I turned the

4     wrong way.  I did come from a good family and I made some

5     mistakes for sure.  I was selfcenterred and selfish, dishonest,

6     egotistical, arrogant, and really only gave a shit about

7     myself.  Everything I thought about was just me.  It was me,

8     me, me.  I was the type of guy that if life got in my way, I

9     pouted it and I threw tantrums.

10          THE COURT:  Well, there is a difference between

11     egotistical and getting your way and pouting.  On the one hand,

12     there are a lot of people like that, and then people who are

13     like that who commit crimes.  You're talking about two

14     different things.

15          THE DEFENDANT:  Right.  I'm talking about, as I grew

16     into -- coming from Johnson & Wales into a man.  I remember the

17     first day, I wasn't always, you know, I wasn't always, you

18     know, I wasn't always into the scams and the money and the

19     life.  But, what I could tell you is that, you know, jail did

20     save my life, you know.  I do -- I accept everything that you

21     said and I am guilty of all the things that you said.  When I

22     did go to jail, if I didn't go into jail, I would be dead right

23     now, by January.  Drugs and alcohol and steroids and money and

24     ego and all those things, they took over my life.  I didn't get

25     it.  I didn't get it until everything cleared out of my body

L79ChulS

1    and my mind and I finally was able to see how badly I hurt

2    people and what I would do if somebody did that to my father,

3    to my mother, to my family.  The day that it really hit me was

4    when my father hysterically was crying on the telephone, what I

5    did to other people and how badly I hurt their families.  I get

6    all that.

7            Up until I was in jail, you're right, it was

8    selfinterest that I was helping the government.  I wasn't -- I

9    didn't think of the smaller picture.  I was just feeding my ego

10   and feeding myself the whole time.  Money is what made me, but

11   at the end of the day, when I went to jail and I had shit and I

12   got beat up and went through all the stuff and came through,

13   all the drugs came out of me and I had seizures and I had some

14   hardship and I had no more money and I had nothing, that's what

15   changed me.

16           I throw myself at the mercy of the Court and you, your

17   Honor.  I'm not asking for anything other than a chance to

18   continue making amends to people.  If the U.S.A. needed me

19   right now, after sentencing, if they needed something from me,

20   I would be right there continuing to make amends to the people

21   I have harmed.  I do understand what I did and I do understand

22   how badly I hurt people.  If I ever did -- and I use my family

23   just as an example.  I broke up families, I hurt people, I took

24   money off the table, especially at a time like this, the

25   victims of my crimes didn't deserve this, and I did continue to

L79ChulS

1    do this on an ongoing basis.  I'm very sorry for what I've

2    done.  There is nothing I could ever do to the direct victims

3    that I've hurt, but I could continue making amends.

4            Like I said, I throw myself at the mercy of you and of

5    the Court.  When I do get out of jail, when I do come out of

6    prison, I would like to continue making amends to these people

7    in any way that I can, obviously with restitution, but if I

8    could help with any type of, you know, I'll take direction from

9    anybody that can give it in order to make these things right,

10   because I've harmed a lot of people and, in turn, have harmed

11   their families.  I know that's the worst thing I've done in my

12   life and the worst mistake I've ever made, anything that I've

13   done to myself or anything that is secondary.  It's no excuse

14   to do drugs or any of that stuff, because that's a choice of

15   mine.

16           But I can tell you, as I've been incarcerated, my mind

17   is cleared and it's very -- I was a very bad person up until

18   the point of where I'm trying to making amends to these people

19   in any way that I can, and I know that me being in prison is

20   one of the things that will satisfy some of those amends, but I

21   will continue for the rest of my life to make these amendments

22   as much as possible and that's the program I'll live by.

23           So thank you, your Honor.

24           THE COURT:  Thank you, sir.  I think your remarks are

25   very heartfelt, I actually do.  I think you have seen the

L79ChulS

1  light.

2         There still is a need for punishment and for general

3  deterrence and individual deterrence.  Individual deterrence,

4  the need for individual deterrence is lessened because I do

5  think you're very sincere.

6         I'm going to give you a sentence lower than I thought

7  I would when I came in, given the government has actually gone

8  the back for you here, I don't know if you realize that.

9  Usually, if a cooperator fails, they're very reluctant to

10 support that person at sentencing, but here they have.

11        I think the most important thing you can do while in

12 prison is better yourself, sir.  Help others, take all the

13 courses you can, educational, vocational, if they offer them.

14 You'll be transferred to a BOP facility that has more

15 programming available to you.  Use your time effectively in

16 prison.  If it's possible, take some work.  It's got to be

17 easier to sit around and do whatever job they have you do, but

18 I think you can do better than that.

19        Let me think for a moment here.

20        I have been presented with an order of restitution.

21 The schedule was emailed from Ms. Fletcher, who is on the line,

22 to my deputy while we were talking, and it provides restitution

23 in the amount of $10,535,618, joint and several liability with

24 Arash Ketabchi and Andrew Owimrin.

25        The schedule of victims will be filed under seal.  The

L79ChulS

1    schedule is attached, it's quite long, as you might imagine.

2            Now, does the defense want an opportunity to look at

3    this?  I don't know to what extent you discussed it with the

4    government.

5            MR. KLEINER:  I have discussed it with the government

6    in the past, Judge.  I have nothing to review.  I trust the

7    government.

8            THE COURT:  The forfeiture is the entry of the money

9    judgment in the amount of $2,500,000, which represents the

10   amount of proceeds traceable to the offenses charged in counts

11   1 through 3 of the information.  The proposed order of

12   forfeiture is signed by Mr. Sobelman, Mr. Hult, Mr. Kleiner.

13           I was going to sentence you to a higher sentence than

14   I'm now prepared to.  I'm going to sentence you to 60 months,

15   sir, which is the recommendation of the probation department.

16   That takes into account your cooperation.  It also takes into

17   account what I've heard here.  Again, I was going to sentence

18   you to higher than that, because I was struck by the fact that

19   you were integral to all these names that I heard so much

20   about, as I say, it rarely being the progenitors, the well

21   screen from that olive branch and so forth that came out of Tax

22   Club, Top Shelf, CDC, but I'm giving account to your

23   cooperation.

24           I tend to agree with your lawyer, Mr. Kleiner, in

25   regard to the New Jersey proceedings.  It's a little hard to

L79ChulS

1  know to what extent there are very serious things and that were

2  not.  That area of the law, marijuana, CBC, THC is changing

3  very quickly, so I'm not terribly troubled by that.  I am

4  troubled by the fact that, regardless of the specific merits of

5  those, to what extent they'll proceed, it's a clear violation

6  of your cooperation agreement.  There is no way the government

7  could use you as a witness after those proceedings, but I am

8  taking into account your cooperation, obviously.

9        I said that I am adopting the findings of fact in the

10 presentence report.

11       I told you the sentence I intend to impose will be 60

12 months, three years supervised release, restitution and

13 forfeiture and the standard mandatory and special conditions

14 recommended.

15       Please rise, sir, and I will impose sentence.

16       I hereby find the total offense is 36, the criminal

17 history category 1, the guideline range is 188 to 235, to be

18 followed by a mandatory consecutive 24 months on count 2 for a

19 total guideline range of 212 to 259 months.  So as your

20 exposure, sir, it's very, very high.

21       Pursuant to the Sentencing Reform Act of 1984, it is

22 the judgment of this Court that the defendant, Ryan Hult, is

23 hereby committed to the custody of the Bureau of Prisons to be

24 imprisoned for a term of 36 months on count 1, 3, 4, and 5,

25 each to run concurrent with each other, plus a consecutive 24

L79ChulS

1   months on count 2.  Count 2, a 24-month sentence, is to run

2   consecutive to the concurrent terms on counts 1, 3, 4, and 5.

3   I realize that's a little confusing.

4          Government, do you understand what I'm doing?

5          MR. SOBELMAN:  Yes, your Honor.

6          THE COURT:  Defense, do you?

7          MR. KLEINER:  Yes, sir.

8          THE COURT:  So that will be a 60-month total, and it

9   is a substantial variance.  The reason for the variance is

10  primarily the cooperation of the defendant and his remorse,

11  which I feel is quite genuine.  I think his eyes have been

12  opened to some of what he's been doing, if not all.

13         Upon release from imprisonment, Mr. Hult, you'll be

14  placed on supervised release for a term of three years with the

15  conditions recommended by the probation department.  The three

16  years will be on counts 1, 3, 4, and 5, concurrent, and then

17  one year on count 2, which will all run concurrent with each

18  other.  So it's a total of three years, one year on count 2,

19  three years on counts 1, 3, 4, and 5, all concurrent.

20         You shall abide by the following mandatory conditions:

21  You shall not commit another federal, state, or local crime;

22  you shall not illegally possess a controlled substance; you

23  shall not possess a firearm, dangerous weapon, or destructive

24  device; you shall refrain from any unlawful use of a controlled

25  substance; you shall submit to one drug test within 15 days of

L79ChulS

placement on supervised release and at least two unscheduled

drug tests thereafter as directed by his probation officer; you

shall cooperate in the collection of DNA as directed by his

probation officer; you shall comply with standard conditions 1

through 12.

Plus the following special conditions:  He shall

submit himself to a search by a probation office and, if

needed, with the assistance of law enforcement when there is

reasonable suspicion concerning the violation of the conditions

of supervised release or any unlawful conduct; two, he must

provide his probation officer with access to all the requested

financial information; three, he must not incur new credit

charges or open additional lines of credit without the approval

of his probation officer, unless he's in compliance with the

installment payment schedule I'm about to enter; four, he will

participate in an outpatient treatment program approved by the

probation department; within 72 hours of release from the

custody of the Bureau of Prisons, you shall report your person

to the probation office in the district which he is released.

I am not imposing the fine given the fact that the

defendant lacks the ability to pay a fine at this time, and

I've taken into account his lack of assets, his modest income.

I am imposing restitution.  I'm signing the order of

restitution in the amount of $10,535,618.  I am sealing

Schedule A.  This is joint and several with Arash Ketabchi and

L79ChulS

1  Andrew Owimrin.  Restitution payments may be made payable to

2  the Southern District of New York Clerk of the Court.

3  Restitution shall be at 15 percent of this defendant's gross

4  monthly earnings.  This is in consideration of all the factors

5  in 18 U.S.C. 3664(f)(2), including the defendant's lack of

6  assets, his projected earnings and other income, and his

7  financial obligations.  While detained he shall make

8  installment payments toward his restitution obligation through

9  the Bureau of Prisons Inmate Financial Responsibility Plan.

10         I am also signing a forfeiture order, as I said, in

11  the sum of $2,500,000, and I have signed that order, as well.

12         I am directing the payment of special assessment of

13  $500, which is due immediately.

14         As I said, I've sentenced this defendant below the

15  guidelines on a variance basis due primarily to his remorse and

16  his cooperation.

17         Mr. Kleiner, do you know of any legal reason why the

18  sentence should not be imposed as I have stated?

19         MR. KLEINER:  No, sir.

20         THE COURT:  Government?

21         MR. SOBELMAN:  No, your Honor.  We would ask that the

22  Court add a special condition that the defendant be required to

23  continue his cooperation during his period of incarceration and

24  his period of supervised release.

25         THE COURT:  I hereby order the sentence to be imposed

L79ChulS

```
 1   as I have stated it.
 2           What's the position of the defense on that request by
 3   the government?
 4           MR. KLEINER:  Same argument I made at sentencing,
 5   Judge.  He's going to continue to cooperate.
 6           THE COURT:  All right.  Then I'll impose that as a
 7   special condition.  Continued cooperation by the defendant
 8   during the period of incarceration and supervised release if
 9   requested by the government.
10           Mr. Hult, you have the right to appeal the sentence I
11   just imposed on you.  If you cannot pay the cost of an appeal,
12   you have the right to apply to leave to appeal in forma
13   pauperis.  If you make the request, the clerk of court will
14   prepare and file a notice of appeal on your behalf immediately.
15   If you do wish to appeal, sir, all you have to do is tell
16   Mr. Kleiner that.
17           In that event, Mr. Kleiner, I'm asking you to file
18   that notice of appeal if your client seeks it.
19           MR. KLEINER:  Yes, sir.
20           THE COURT:  Do you understand your appeal rights,
21   Mr. Hult?
22           THE DEFENDANT:  Yes, your Honor.
23           THE COURT:  I take it there are no open counts here?
24           MR. SOBELMAN:  That's correct, your Honor.
25           THE COURT:  Mr. Hult, this has been within a drinking
```

L79ChulS

1  proceeding.  I've learned a lot, I've learned about you, I

2  think you were very heartfelt, I heard some unusual things from

3  your lawyer and from the government, and I adjusted my sentence

4  accordingly, I think it's appropriate.  I wish you good luck,

5  sir.  You can turn your life around.  It sounds like you're

6  well on your way to doing it.  I just urge you to use your

7  remaining time in prison as effectively as you can.  You can be

8  a model of other prisoners if you choose to.

9          THE DEFENDANT:  I hope to do so, your Honor.  Thank

10  you very much.

11          THE COURT:  Thank you, gentlemen.

12                          * * *

13

14

15

16

17

18

19

20

21

22

23

24

25